UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

United States of America,

        Plaintiff,

  vs.                  REPORT AND
                        RECOMMENDATION

Nakia Lashawn Harris,
a/k/a "Shawn Harris,"

                Defendant.           Crim.  07-0021(JRT/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

I.  Introduction

    This  matter  came  before  the  undersigned  United  States  Magistrate  Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the  following Motions of the Defendant:

            1.     The Defendant's Motion to Suppress Evidence from
                  Search; and

            2.     The Defendant's Motion to Suppress Statements.

A Hearing on the Motions was conducted on March 22, 2007, at which time, the

Defendant  appeared  personally,  and  by  Robert  W.  Owens,  Jr.,  Esq.,  and  the

Government appeared by Tracy L. Perzel, Assistant United States Attorney.   For

reasons which follow, we recommend that each of the Defendant's Motions be denied.

## II.  Factual Background

The Defendant is charged with one (1) Count of possession of a firearm by a

felon, in violation of Title 18 U.S.C. §§922(g)(1), and 924(a)(2).   The events which

give rise to those charges are alleged to have taken place on or about August 1, 2006,

in this State and District.   As pertinent to the charges, and to the Motions now before

us, the operative facts may be briefly summarized.[1]

At the Hearing, Christopher Martin ("Martin"), who is an officer with the Police

Department of Moorhead, Minnesota, testified at the instance of the Government.

According to Martin, on August 1, 2006, he received a call, at approximately 1:45

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record."  See, United States v. Santiago, 410 F.3d 193, 198 (5th Cir. 2005), cert. denied, 126 S.Ct. 1565 (2006).  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

o'clock p.m., asking him to report to the Days Inn Hotel ("Days Inn"), in Moorhead, to assist law enforcement officer David Johnson ("Johnson") locate a sixteen (16) year old female runaway, "C.D."  Martin understood that C.D. might be at the Days Inn with the Defendant.

According to Martin, he and another law enforcement officer arrived at the Days Inn and learned, from Johnson, that the Defendant was an active gang member, that he had previously been arrested for aggravated robbery, and that a valid Order for Protection ("OFP") had been issued against the Defendant, so as to prevent him from having contact with C.D.  See, Government's Exhibit 1.  The front desk clerk at the Days Inn provided the officers with the Defendant's room number, and Martin and the other officers approached the front, and rear doors, of the hotel room.  After the officers identified themselves, C.D. opened the front door to the room, and C.D. and the Defendant were placed under arrest and handcuffed.

A subsequent search of C.D.'s person produced a set of car keys that she identified as hers, and C.D. told the officers conducting the search that her car was located in the Days Inn parking lot.  Martin and the other officers also searched the Defendant, and found no additional car keys.  When the officers searched the hotel room that was occupied by C.D., and the Defendant, they found a few hygiene

products, but almost no personal property, and no additional car keys.   Martin testified that, after the search of the hotel room, he asked the Defendant about the location of his car, and the Defendant stated that he no longer had a car, as he had given his car to C.D.

At that point, the law enforcement officers removed the Defendant and C.D. from the Days Inn, and Martin placed C.D. in his patrol car, and transported her to a shelter facility.   During the drive to the shelter, Martin told C.D. that his partners would be searching the car that she had identified as hers in order to gather information, and he asked her if there were any weapons, such as knives or guns, in that vehicle.   In his testimony, Martin admitted that, at the time that he asked C.D. about possible weapons in the vehicle, none of the officers actually intended to search the vehicle that C.D. had identified as hers.   In response to his question, C.D. told Martin that there was a gun, which she claimed belonged to her, that was located in the trunk of the vehicle.   Martin testified that he questioned C.D. further about the gun, and that she identified the gun as hers a second time.   Martin asked C.D. to identify the vehicle, and she told him that it was a maroon Grand Prix.

After C.D. told Martin that there was a gun in the trunk of her vehicle, Martin radioed Johnson, and asked that Johnson attempt to locate the vehicle based on the

description that C.D. had provided.  Johnson proved unable to locate the vehicle in the Days Inn parking lot, and called Martin for further details as to the location of the Grand Prix. Martin asked C.D. where she had left the vehicle, and C.D. provided Martin with a more detailed description of the vehicle's location.  Approximately one-half hour after the arrest of C.D. and the Defendant, Martin dropped C.D. off at the shelter facility, and returned to the Days Inn, where he found the vehicle in a location that was consistent with C.D.'s description.  The law enforcement officers ran a trace on the vehicle's license plates and license plate tabs, which were issued in Minnesota, and also on the vehicle identification number.  None of those searches provided any information as to the owner of the vehicle.

Martin testified that, as he was standing outside of the vehicle, he could see into the interior, and he observed a dark-colored woman's purse lying on the passenger side floor.  Martin could also see a duffle bag on the rear seat.  No purse, or personal belongings other than hygiene products, had been found during the previous search of the hotel room, and Martin testified that he assumed that the purse, and the duffel bag, belonged to C.D.  He further testified that he anticipated finding a gun in the trunk of the vehicle, since C.D. had told him he would, and that he considered the gun to be evidence of a crime.  Martin admitted that he did not have the consent of either C.D.,

or the Defendant, to search the vehicle, and that none of the law enforcement officers had asked for either C.D.'s, or the Defendant's, consent.

Martin had in his possession the car keys that he had taken from C.D. and, using those keys, he unlocked the doors to the vehicle, and proceeded to conduct an inventory search.  In his initial search of the vehicle's passenger compartment, Martin found multiple cell phones, several pieces of paper, and a notebook that had been wedged in above the visor.  On examination, one of the pieces of paper was the registration for the vehicle, which was in the Defendant's name.  Several of the other pieces of paper were receipts from wire transfers.  Martin also examined the notebook, which he found above the visor, and found dollar amounts and symbols that, he believed, had a connection to drug trafficking.  Martin testified that he was familiar with drug ledgers, and that he believed that the notebook was a drug ledger.

Martin continued his search of the vehicle, and unlocked the trunk with a remote control that he found in the passenger compartment.  After he opened the trunk of the vehicle, Martin saw a red backpack.  Johnson felt the unopened backpack and commented that, based upon what he felt, he believed that there was a gun inside. Johnson then opened the backpack and found a 9mm handgun.  Martin also found a police scanner in the trunk of the vehicle, and he testified that he believed the presence

of the scanner was evidence of drug trafficking activity.  According to Martin, the officers were not able to conduct a full search of the vehicle in the hotel parking lot so, following the written inventory policy of the police department, Martin called for a tow truck, waited with the vehicle for the tow truck to arrive, and then transported the vehicle to the police impound lot.

Special Agent Donald Burns ("Burns"), who is a law enforcement officer with the Central Minnesota Drug Task Force, also testified at the Motions Hearing at the request of the Government.  Burns testified that, in 2005 and 2006, he had been involved in a narcotics investigation involving two (2) individuals -- Jeremy Burndt  and Glen Forehand ("Forehand") -- and that he had believed that Forehand was the head of a drug trafficking organization.  In approximately July of 2006, Burns developed reason to believe that the Defendant had a role as a distributor of narcotics in the organization run by Forehand. See, Government's Exhibit 3.  On July 21, 2006, based on his belief that the Defendant was involved in drug trafficking, Burns applied for a Search Warrant for the Defendant's residence in Otter Tail County, Minnesota, as well as for the Defendant's vehicle, which was identified in the Warrant application as a 2004 Pontiac four (4) door sedan, with Washington State license plates.  Id.  The application for the Search Warrant was granted, and Burns carried out a search of the

Defendant's residence on July 21, 2006, but was unable to search the named vehicle, as it was not present at the residence.  However, during his search of the Defendant's residence, Burns found evidence of drug trafficking.

At the Motions Hearing, Burns testified that he believed that the vehicle at the Days Inn, which C.D. had identified as hers, was the same vehicle as that named in the Search Warrant of July 21, 2006, and that he believed that the Defendant had retitled the vehicle, in Minnesota, since Burns originally applied for the Search Warrant.  Burns also testified that, since the execution of the Search Warrant for the Defendant's residence, in July of 2006, he had been actively attempting to locate the Defendant, as well as his vehicle, by checking daily for related arrests, and had worked in conjunction with other law enforcement officers in that endeavor.  According to Burns, he was notified of the Defendant's arrest shortly after it took place, and participated in the post-arrest interviews of the Defendant.

Charles Anderson ("Anderson"), who is a law enforcement officer and a member of the Fargo, North Dakota, Drug Task Force, was the third witness to testify at the Hearing, again, at the behest of the Government.  Anderson testified that he was the first law enforcement officer to learn of C.D.'s runaway status, and that he promptly shared that information with Johnson.  In the course of his investigation,

Anderson spoke with a number of potential witnesses about C.D.'s runaway status, including C.D.'s brother and, based upon those conversations, he learned that it was possible that C.D. was with the Defendant, and that the Defendant was involved in drug trafficking activity.  Anderson testified that he learned of the arrest of C.D. and the Defendant in Moorhead, Minnesota, for the violation of the OFP on August 1, 2006.

## III.  Discussion

A.    The Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.

The Defendant moves to suppress evidence that was obtained as a result of the search of the vehicle in the Days Inn parking lot, including the search of the passenger compartment, the trunk of the vehicle, and the backpack that was found in the trunk of the vehicle.[2]

---

[2]In his Motion to Suppress Evidence Obtained as a Result of Search and Seizure, the Defendant additionally challenged the lawfulness of the Search Warrant that was issued for his residence on July 21, 2006.  See, Motion to Suppress Evidence Obtained as a Result of Search and Seizure, Docket No. 35, at p.1.  At the Motions Hearing, the Defendant withdrew that Motion, and explained that the only challenge that he was interposing, in this action, was to the lawfulness of the search of the vehicle, including the vehicle's trunk, and the backpack.  Therefore, we recommend that, to the extent that the Defendant's Motion to Suppress challenges the lawfulness
(continued...)

The Defendant premises his Motion on the fact that the search of the vehicle, and of the back pack located in the trunk of the vehicle, were conducted without a Warrant, and that law enforcement lacked probable cause to conduct those searches.

1.     Standard of Review.  The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  United States Constitution, Amendment IV.  "Searches conducted without a warrant are per se unreasonable, subject to a few well-established exceptions."  United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005), citing United States v. Hill, 386 F.3d 855, 858 (8th Cir. 2004).  The burden lies on the Government to establish the existence of an exception to the Warrant requirement.  Id.

One exception to the Warrant requirement is the "automobile exception," "which authorizes officers to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity."  United States v.

---

²(...continued)
of the Search Warrant for his  residence, the Motion be denied, but without prejudice, so that the Defendant can renew the Motion in the event of a Superseding Indictment.

Hill, supra at 858, citing United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2003).  In

the context of automobiles, our Court of Appeals has reiterated:

> As long as law enforcement officials have probable cause,
> they may search an automobile without a warrant under the
> automobile exception.  See Pennsylvania v. Labron, [518
> U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d
> [399] at 401 [(8th Cir. 1996)].  Probable cause exists when,
> given the totality of the circumstances, a reasonable person
> could believe there is a fair probability that contraband or
> evidence of a crime would be found in a particular place.
> See Illinois v. Gates, [462 U.S. 213, 238] (1983).

United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

A second exception allows the admission of evidence obtained in the course of a

warrantless search if the two (2) prongs of the inevitable discovery doctrine are proved

by a preponderance of the evidence, namely:

> (1)    there is a reasonable probability that the evidence
> would have been discovered by lawful means in the absence
> of police misconduct, and
>
> (2)    the government was actively pursuing a substantial,
> alternate line of investigation at the time of the constitutional
> violation.

United States v. Thomas, --- F.3d ---, 2007 WL 913517 (8th Cir., March 28, 2007),

citing United States v. Glenn, 152 F.3d 1047, 1049 (8th Cir. 1998); United States v.

Alvarez-Gonzalez, 319 F.3d 1070, 1072 (8th Cir. 2003).  Our Court of Appeals has

taken a narrow view of the doctrine of inevitable discovery, see, United States v.

Warford, 439 F.3d 836, 844 (8th Cir. 2006), and for it to apply the Government must be able to show concrete evidence that the police explored an alternative investigatory approach that would have led to the ultimate discovery of the contested evidence. See, United States v. Warford, 439 F.3d 836, 844 (8th Cir. 2006); United States v. Conner, 127 F.3d 663, 667-68 (8th Cir. 1997).

Finally, Courts may admit evidence seized in the course of warrantless inventory searches of vehicles which have been impounded pursuant to standard police procedure. See, United States v. Betterton, 417 F.3d 826, 830 (8th Cir. 2005)("To be constitutional, '[a] warrantless inventory search must be done pursuant to "standard police procedures" and for the purpose of "protecting the car and its contents."'"), quoting United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998).

As the Supreme Court explained, in South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976), "[i]n the interests of public safety and as part of what the Court has called 'community caretaking functions," Cady v. Dombrowski, [413 U.S. 433, 441 (1973)], automobiles are frequently taken into police custody" and, when they are, the police "generally follow a routine practice of securing and inventorying the automobiles' contents." Those inventorying policies were developed to protect "the owner's property while it remains in police custody," to protect "the police against

claims or disputes over lost or stolen property," and to protect "the police from potential danger." Id. at 369; see also, United States v. Mayfield, 161 F.3d 1143 (8th Cir. 1998), cert. denied, 526 U.S. 1045 (1999).

The Supreme Court has determined "that inventories pursuant to standard police procedures are reasonable" under the Fourth Amendment. South Dakota v. Opperman, supra at 372; see also, Colorado v. Bertine, 479 U.S. 367, 374 (1987); United States v. Mayfield, supra at 1145; United States v. Hartje, 251 F.3d 771, 775-76 (8th Cir. 2001), cert. denied, 534 U.S. 1116 (2002); United States v. Wallace, 102 F.3d 346, 348 (8th Cir. 1996)("In other words, '[a]s long as impoundment pursuant to the community caretaking [or public safety] function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking [or public safety] motives will not invalidate the search.'"), quoting United States v. Marshall, 986 F.2d 1171, 1175-76 (8th Cir. 1993); United States v. Davis, 882 F.2d 1334, 1338 (8th Cir. 1989), cert. denied, 494 U.S. 1027 (1990)("To pass constitutional muster, the search also must be conducted pursuant to standard police procedures.").

2.    Legal Analysis.  We begin our legal analysis by noting that the Defendant does not challenge the lawfulness of his arrest.[3]  Further, the Defendant lacks standing to challenge the arrest of C.D., or the search of her person, incident to her arrest.[4]  An

---

[3]Although, in his Motions to Suppress Statements, the Defendant alleged that the law enforcement officers lacked probable cause for his arrest, at the Hearing, he waived that challenge, and stipulated to the lawfulness of his arrest.  Even if the Defendant had not so conceded the arrest's lawfulness, there is sufficient evidence, in the Record presented, to allow the conclusion that law enforcement had probable cause for the warrantless arrest of the Defendant.  At the Hearing, the Government introduced evidence that a valid Order for Protection ("OFP"), which  barred the Defendant from harassing or contacting C.D., was issued on June 30, 2006, and that OFP was in effect until June 30, 2007.  See, Government's Exhibit 1.  As authorized by Minnesota Statutes Section 609.748, Subdivision 6(e), the language of the OFP provides as follows:

> A police officer shall arrest a respondent without a warrant and take them to jail if a police officer believes that a responded has violated this [OFP] and shall hold the respondent in jail for at least 36 hours, excluding the day of arrest, Sundays, and legal holidays, unless the respondent is released earlier by a judge or judicial officer.

Id. at unnumbered page 3.

The OFP was served by publication on July 10, 2006.  Id. at unnumbered pages 10-11.  At the Hearing, we heard testimony from law enforcement officials that the Defendant was discovered on August 1, 2006, in a hotel room with C.D., in violation of the OFP, and therefore, the officers were authorized by Section 609.748 to arrest the Defendant without a Warrant.

[4]"We use the term 'standing' as a shorthand reference to the issue of whether [the defendant's] Fourth Amendment interests were implicated by the challenged

(continued...)

arrest is a seizure of a person, and so must comport with the requirements established by the Fourth Amendment.  See, Gerstein v. Pugh, 420 U.S. 103, 111 (1975).  "[T]he product of a fourth amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damning evidence."  Alderman v. United States, 394 U.S. 165, 171-72 (1969).

Since "Fourth Amendment rights are personal [and] may not be vicariously asserted," Rakas v. Illinois, 439 U.S. 128, 134 (1978), "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable, i.e., one which has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  Minnesota v. Carter, 525 U.S. 83, 99 (1998); United States

---

[4](...continued)
government actions," as "'[t]echnically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence * * * since the Supreme Court in Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), indicated that matters of standing in the context of searches and seizures actually involved substantive Fourth Amendment law.'"  United States v. Green, 275 F.3d 694, 698 n. 3 (8th Cir. 2002), quoting United States v. Sanchez, 943 F.2d 110, 113 n. 1 (1st Cir. 1991).

v. Rodrequez, 859 F.2d 1321, 1325 (8th Cir. 1988)(no standing to challenge the search of a codefendant even when evidence uncovered during the search of the codefendant resulted in the search of the defendant's vehicle), cert. denied, 489 U.S. 1058 (1989); United States v. Baucom, 611 F.2d 253, 254-55 (8th Cir. 1979)(no standing for defendant to challenge the search of an unindicted coconspirator); see also, United States v. Meadows, 885 F. Supp. 1, 3-4 (D.D.C. 1995)(concluding that the discovery of a motel room key pursuant to a search incident to a codefendant's unlawful arrest, which led to the discovery of contraband in the motel room, could not be challenged by the remaining defendants).  As a consequence, the Defendant has no standing to suppress the car keys that were produced in the search incident to C.D.'s arrest, or to suppress the statements made by C.D. to Martin, in which she claimed possession of the vehicle, and also advised him of the presence of a weapon in the vehicle's trunk.

Here, as the party claiming "standing," the Defendant has failed to satisfy his burden in proving a sufficiently close connection to the vehicle in question, so as to give him the legal right to challenge the vehicle's search as being illegally performed. In United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994), our Court of Appeals

detailed a number of factors to weigh in considering whether a defendant had a

subjective expectation of privacy, including the following

> [O]wnership; possession and/or control of the area
> searched or item seized; historical use of the property or
> item; ability to regulate access; the totality of the
> circumstances surrounding the search; the existence or
> nonexistence of a subjective anticipation of privacy; and the
> objective reasonableness of the expectation of privacy
> considering the specific facts of the case.

In <u>Gomez</u>, our Court of Appeals concluded that a defendant did not have a legitimate

expectation of privacy in a vehicle, when he expressly told the law enforcement

officers that he was not the vehicle's owner.  See also, <u>United States v. Brown</u>, 408

F.3d 1049, 1051 (8th Cir. 2005)(no reasonable expectation of privacy in house of

another when defendant was not present at time of search, did not live at residence,

and did not have key to residence); <u>United States v. Parker</u>, 530 F.2d 208, 213 (8th Cir.

1976)(no standing to complain of seizure of contraband arising from search of vehicle

when the defendant had no possessory interest in the vehicle and was not charged with

a crime involving that contraband).

As Martin testified at the Hearing, without contradiction, C.D. and the Defendant

were both arrested in their hotel room, handcuffed, and taken into custody.  Incident

to her arrest, C.D. was searched, and law enforcement found a set of car keys on her

- 17 -

person.  Martin asked C.D. who owned the car, and she said that the vehicle belonged to her.   The Defendant was also searched pursuant to his arrest, and no car keys were found on his person.  Further, the Defendant explicitly denied any possessory interest in the vehicle, and told the police officers, at the time of the arrest, that he did not have a car, and that he had given his car to C.D.  Thus, even if the Defendant did have a subjective expectation of privacy in the vehicle, we would still find that his expectation was not reasonable, as "a person has no reasonable expectation of privacy in an automobile belonging to another."   United States v. Fischer, 2007 WL 853475 at *2 (D. Minn., March 20, 2007), quoting United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001).

Furthermore, a defendant has no standing to contest a search of property when he has disclaimed ownership of that property, because the defendant has abandoned any interest in that property.  See, United States v. Washington, 197 F.3d 1214, 1216 (8th Cir. 1999), cert. denied, 531 U.S. 1015 (2000); United States v. Sanders, 130 F.3d 1316, 1317 (8th Cir. 1997); see also,  United States v. Price, 16 Fed. Appx. 542, 544 (8th Cir. 2001)(warrantless search of abandoned property is constitutional because any expectation of privacy in item searched is forfeited upon its abandonment), citing United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997).  This is true even if the

police officer knows, or should have known, that the Defendant was lying when he disclaimed ownership in the vehicle.  See, United States v. Sanders, supra at 1317-18; United States v. Ruiz, 935 F.2d 982, 983-85 (8th Cir. 1991).

In determining if an item is abandoned, Courts in this District evaluate the circumstances, including the denial of ownership and the physical relinquishment of the property.  See, United States v. Hawkins, 116 Fed. Appx. 776, 778 (8th Cir. 2004); United States v. Landry, 154 F.3d 897, 899 (8th Cir. 1998), cert. denied, 525 U.S. 1086 (1999).  Here the Defendant denied ownership of the vehicle to the arresting officers, and told them that he had given his vehicle to C.D.  The Defendant had further surrendered possession of the car keys to C.D.  On this Record, we conclude that the Defendant had disclaimed any possessory interest in the vehicle, and therefore, he lost any standing to contest its search.

While our analysis could end here, as we have found an adequate ground upon which to deny the Defendant's Motion to Suppress, the Government has offered alternative grounds for the same result which, in the interests of completeness, we address.  First, the Government urges that the officers had probable cause to search the automobile.  We conclude, however, that, while a close question, probable cause was lacking.  The Government's position is premised on the fact that, in driving his

vehicle to the shelter, Martin asked C.D. if there were any weapons in the vehicle that she had previously identified as hers, and she stated that a gun, belonging to her, was located in the trunk of the vehicle. "The assessment of probable cause is to be based on objective facts that would justify the issuance of a warrant." United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993), cert. denied, 510 U.S. 1138 (1994), citing United States v. Ross, supra at 808; see also, United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000)("As long as the law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception.").

Here, C.D. informed Martin that she was in possession of a gun that was located in the trunk of her car. Minnesota Statutes Section 624.713, Subdivision 1, provides that "the following persons shall not be entitled to possess a pistol or semiautomatic military-style assault weapon or, except for clause (a), any other firearm." Section 624.713, clause (a), provides as follows:

> [A] person under the age of 18 years except that a person under 18 may carry or possess a pistol or semiautomatic military-style assault weapon (i) in the actual presence or under the direct supervision of the person's parent or guardian, (ii) for the purpose of military drill under the auspices of a legally recognized military organization and under competent supervision, (iii) for the purpose of instruction, competition, or target practice on a firing range approved by the chief of police or county sheriff in whose

> jurisdiction the range is located and under direct
> supervision; or (iv) if the person has successfully
> completed a course designed to teach marksmanship and
> safety with a pistol or semiautomatic military-style assault
> weapon and approved by the commissioner of natural
> resources.

Under the circumstances, we conclude that Martin did not have probable cause to

believe that C.D. was in violation of Minnesota Statutes Section 624.713, Subdivision

1. Of course, Martin was aware that C.D. was a minor. Under Section 624.713,

Subdivision 1, a person under the age of eighteen (18) years may not possess a

firearm, unless she falls under one of four listed exceptions.[5]

On the Record presented, Martin properly believed that certain of the

exceptions did not apply to C.D., for he was well aware that C.D. was not in the

presence, or under the direct supervision of her parents, as she had been reported as

a runaway, and was found in the exclusive company of the Defendant. The second

---

[5]Minnesota Statutes Section 624.712 provides definitions for both "pistol," and "semiautomatic military-style assault weapon," but does not define "firearm." However, the Minnesota Court of Appeals has determined that the term "firearm" should be broadly construed. See, Minnesota v. Fleming, 724 N.W.2d 537, 539 (Minn. App. 2006), citing Minnesota v. Seifert, 256 N.W.2d 87, 88 (Minn. 1977). In Seifert, the Minnesota Supreme Court adopted the statutory definition of a firearm as "'any gun from which a shot or a projectile is discharged by means of explosive, gas, or compressed air.'" Minnesota v. Seifert, supra, quoting Minnesota Statutes Section 97.40, Subdivision 34.

and third exceptions to the bar on the possession of firearms by minors, which permit a minor to possess a pistol or semiautomatic weapon for military drill, or for instruction on a firing range, are also clearly inapplicable under the circumstances. However, there is nothing in this Record to establish, one way or the other, that C.D. had completed the requisite training so as to be exempted from the prohibition on her possession of a firearm.[6]  While we are permitted to make reasonable inferences from the evidence, here there is no evidentiary basis upon which to infer that C.D.'s possession of the firearm was illegal.

As a second basis upon which to deny the Defendant's Motion to Suppress, the Government laid the groundwork for a claim that the inevitable discovery doctrine provides an independent ground for admitting evidence seized during the search of the vehicle.  In support of that claim, Burns testified that, pursuant to an investigation of

---

[6]Even though the statutory exceptions to the general ban, which is imposed by Minnesota Statutes Section 624.713, Subdivision 1, on the possession of a firearm by a minor, "are construed as affirmative defenses on which the defendant carries the burden of production," that does not alter the fact that one of those exceptions could have applied, but the requisite questions were not asked, by Martin, to determine its applicability.  In the Matter of the Welfare of R.J.R., 2004 WL 2939332 at *4 (Minn. App., December 21, 2004), citing State v. Taylor, 594 N.W.2d 533, 535 (Minn. App. 1999).  If probable cause could be supplied by tacit assumption, or pure hunch, there would be little to promote the securing of a Warrant, from a disinterested Judicial Officer, as arrests, and searches, could be effected upon simple surmise.

a drug trafficking organization in which he was involved, he had obtained a Search Warrant for the Defendant's house, and vehicle, on July 21, 2006.   Burns further testified that when he executed that Warrant  he found evidence of drug trafficking in the Defendant's residence, but he was unable to search the Defendant's vehicle as it was not present at that time.   According to Burns, in connection with his ongoing drug trafficking investigation, following the execution of the Warrant, he was "extremely actively" searching for the Defendant, and his vehicle, and was making daily checks on arrests in order to determine if the Defendant had been apprehended.   In addition, Burns made regular contact with Anderson to see if the Defendant, or his vehicle, had been located.   After the Defendant was arrested, Burns participated in the interviews of the Defendant.   Given the extent of his involvement in searching for the Defendant, as part of his independent drug trafficking investigation, the Government argues that Burns would have become aware that the Defendant had been apprehended and, as a result, would have sought a new Warrant to conduct a search of the Defendant's vehicle.

In addition, the Government offered the testimony of Anderson, who was involved in both the investigation of C.D. as a runaway, and the Defendant in connection with drug trafficking.   Anderson testified that he learned of the Defendant's

arrest on August 1, 2006, and that, if the vehicle had not been searched at the time of the arrest of C.D., and the Defendant, at the Days Inn, he would have applied for a Warrant based on his knowledge of the ongoing narcotics investigation that implicated the Defendant.

In United States v. James, 353 F.3d 606, 616-17 (8th Cir. 2003), our Court of Appeals found that the inevitable discovery doctrine did not apply when the separate investigation that the Government claimed would have resulted in an application for a Search Warrant for the defendant's computer and computer discs had already been concluded and the defendant arrested.  In contrast, in United States v. Halls, 40 F.3d 275, 277 (8th Cir. 1994), the Court upheld an unlawful warrantless search of a motorist detained in Missouri, when Iowa police were waiting for him on the other side of the State border with a Warrant for his arrest pursuant to an entirely different investigation. The Halls Court reasoned that suppressing the evidence from the illegal search "would impermissibly place the prosecution 'in a **worse** position simply because of some earlier police error or misconduct.'"  Id., citing United States v. Nix, 467 U.S. 431, 443 (1984); see also, United States v. Madrid, 152 F.3d 1034, 1041 (8th Cir. 1998).

In a case more closely on point, United States v. Ivey, 915 F.2d 380, 385 (8th Cir. 1990), a passenger in a car was arrested along with a coconspirator at the time of

a drug deal, and a subsequent search of the passenger's purse at the police station uncovered money transfer receipts that were later used against her as evidence of her own involvement with drug trafficking.  In upholding the District Court's decision to admit the evidence obtained during the search of the passenger's purse, based on the inevitable discovery doctrine, the Court noted that, in the course of a separate ongoing investigation of the passenger, the police had previously obtained a Warrant to search her residence for evidence of drug trafficking, which established that they had previously demonstrated probable cause.  Id.

Given the facts before us, we find that the Government has shown sufficient evidence to establish the likelihood that the evidence in the vehicle inevitably would have been discovered by the execution, or re-execution, of the Search Warrant which sought to uncover evidence of drug trafficking.  Both Burns and Anderson  testified that they were actively seeking the apprehension of the Defendant, and that a substantial investigation of the Defendant's drug-related activity was already under way, prior to his arrest for violating the OFP which barred his contact with C.D. Burns further testified that, on learning of the Defendant's arrest, he would have sought a Search Warrant for the Defendant's car, based on evidence that he had obtained during the course of his drug trafficking investigation.  Significantly, based on the

strength of that investigation, Burns had previously obtained a Warrant to search the Defendant's vehicle on July 21, 2006, which was less than two (2) weeks prior to the arrest of C.D., and the Defendant, on August 1, 2006.

As noted by the Defendant, that previous Search Warrant described the Defendant's vehicle as bearing license plates issued by the State of Washington, whereas the vehicle located at the Days Inn had Minnesota plates, and registration tags. However, the Defendant does not contest that the appearance of the vehicle, which was discovered in conjunction with the Defendant's arrest, was identical to that previously identified as the Defendant's, and it does not appear far-fetched that, on learning of the Defendant's arrest, Burns or Anderson would have applied for a Warrant to search a vehicle that matched, in every respect except the license plates, the description of the vehicle they had been actively seeking.

Although the Defendant denied ownership of the vehicle at the time of his arrest, he told the arresting officers that he had "given his vehicle to C.D.," which further identified the vehicle as the one being sought in conjunction with the ongoing investigation of the Defendant's involvement in drug trafficking. The application of the doctrine of inevitable discovery necessarily involves some speculation, see, United States v.Keszthelyi, 308 F.3d 557, 574 (6th Cir. 2002), but we are satisfied that the

Government has satisfied its burden in showing that a Search Warrant would have been obtained for the vehicle, which was found in the Days Inn parking lot, pursuant to the ongoing investigation of the Defendant's involvement in drug trafficking. Accordingly, we recommend that, if the Defendant were, for reasons not apparent to us, found to have standing to contest the search of the vehicle, his Motion to Suppress should be denied on these independent grounds.

Lastly, the Government argues that law enforcement's search of the vehicle was also a permissible inventory search that was conducted in the course of impounding that vehicle. Necessarily, our first inquiry is whether the police made a lawful decision to impound the vehicle. See, United States v. Kimhong Thi Le, 474 F.3d 511, 514 (8th Cir. 2007), citing Cady v. Dombrowski, 413 U.S. 433, 446-48 (1973); United States v. Pappas, 452 F.3d 767, 771 (8th Cir. 2006); United States v. Marshall,  986 F.2d 1171, 1175-76 (8th Cir. 1993). "[P]olice may exercise discretion to impound a vehicle, 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" United States v. Petty, 367 F.3d 1009, 1012 (8th Cir. 2004), quoting Colorado v. Bertine, 479 U.S. 367, 375 (1987); United States v. Kimhong Thi Le, supra. The discretion of the police is limited "to ensure that impoundments and inventory searches are not merely a ruse for

- 27 -

general rummaging in order to discover incriminating evidence." <u>United States v.</u> <u>Kimhong Thi Li</u>, supra, citing <u>United States v. Petty</u>, supra at 1012.

At the Hearing, the Government did not submit a copy of the inventory policy, but offered the testimony of Martin that the Moorhead Police Department has a standard policy regarding inventory searches, that the policy is in writing, and that the search of the vehicle was conducted in accordance with that policy. While we accept Martin's testimony as credible, nothing in that testimony offers insight as to why he, or the other officers on the scene, decided to impound the vehicle, or to conduct the related inventory search. The Government suggests that Minnesota Statutes Section 169.041, Subdivision 4(11), allows police officers to tow a vehicle that they have probable cause to believe "constitutes or contains evidence of a crime," should they conclude that impoundment is necessary to obtain, or preserve evidence of that crime. However, by statute, that authority is limited to the enforcement of State and local parking and traffic laws.

The Government has not challenged the Defendant's assertion that the vehicle was located in a private parking lot, and there has been no showing that the vehicle was parked illegally, such that the arresting officers intended to issue a parking citation for the vehicle, nor is there any showing that the owners of the private parking lot, in which

the vehicle was located, asked the officers to remove the vehicle from their premises. As provided by Minnesota Statutes Section 169.041, Subdivision 4(12), the police may conduct an inventory search when "the driver, operator, or person in physical control of the vehicle is taken into custody and the vehicle is impounded for safekeeping." See, United States v. Hood, 183 F.3d 744, 746 (8th Cir. 1999), reversed on other grounds, 342 F.3d 861 (8th Cir. 2003); State v. Gerard, 2002 WL 1751204 at *4 (Minn. App., July 30, 2002). However, here the Government conceded at the Hearing that the arrest of C.D., and the Defendant, was not pursuant to a traffic stop, and neither C.D., nor the Defendant, was identified as the driver of the vehicle.

At the Hearing, Martin testified that, until C.D. told him that there was a weapon located in the vehicle, none of the arresting officers even intended to search the vehicle. On the Record presented, we are unable to conclude that an inventory search was necessary either to protect the integrity of vehicle, or to insulate the Police Department from claims that the contents of the vehicle had been lost or damaged. While it is true that the officers searched the vehicle, and seized certain of its contents, the vehicle was not in harm's way, but was properly parked in a private lot which, on this Record, posed no hazard to anyone. Since we conclude that the vehicle was

- 29 -

improperly impounded, the inventory search of the vehicle appears to have been a prohibited generalized search.  See, <u>United States v. Petty</u>, supra at 1012.

We have found no authority, nor has any been drawn to our attention, that supports the proposition that law enforcement may impound and inventory the contents of a vehicle that was owned by a defendant, but not in any way connected with the alleged violation for which he was arrested.[7]  Therefore, we conclude that the Government has failed to offer sufficient evidence to support their alternative contention that the search of the vehicle was pursuant to a valid inventory search but, as we have detailed, we deny the Defendant's Motion to Suppress Evidence Obtained by Search and Seizure, because of his lack of standing to challenge the search and, even if standing were present, we would recommend a denial based on the inevitable discovery doctrine.

---

[7]We acknowledge that Martin testified that, from his initial vantage point outside of the vehicle, he could see what appeared to be a woman's purse on the floor of the front passenger seat.  One of the purposes of an inventory search is to protect "the owner's property while it remains in police custody," to protect "the police against claims or disputes over lost or stolen property," and to "protect the police from potential danger."  <u>United States v. May</u>, 440 F. Supp. 2d 1016, 1035 (D. Minn. 2006), citing and quoting <u>South Dakota v. Opperman</u>, 428 U.S. 364, 369 (1976).  However, the presence of a purse, without more, would not justify the impoundment of the vehicle in which the purse was located.

B.      <u>The Defendant's Motion to Suppress Statements, Admissions and Answers</u>.

The Defendant has also moved to suppress the statements that he made to law enforcement, arguing that they were taken without the assistance of counsel, were not freely given and voluntary, and that his arrest was unlawful as the law enforcement officials lacked probable cause, the arrest did not take place in a public place, and there were no exigent circumstance.  See, <u>Docket No. 36</u>.  At the Motions Hearing, the Defendant waived that Motion, but asked for leave of the Court to raise it in the event of a Superseding Indictment.   Consequently, we recommend that the Defendant's Motion to Suppress Statements be denied, but without prejudice.

NOW, THEREFORE, It  is –

RECOMMENDED:

1.      That the Defendant's Motion for Suppression of Evidence Obtained from the Search of the Defendant's vehicle and backpack [Docket No. 35] be denied.

2.      That the Defendant's Motion for Suppression of Evidence Obtained from the Search of his residence [Docket No. 35] be denied, without prejudice.

3.      That the Defendant's Motion for Suppression of Statements [Docket No. 36] be denied, without prejudice.

Dated:  April 20, 2007                          s/Raymond L. Erickson

                                                Raymond L. Erickson
                                                CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than May 7, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure

to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than May 7, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.